**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

CHILDREN'S HOSPITAL OF THE KING'S
DAUGHTERS, INCORPORATED,

                              Plaintiff,

           v.

THOMAS E. PRICE, in his official capacity,
Secretary, Department of Health and Human
Services; PATRICK CONWAY, in his
official capacity, Acting Administrator,
Centers for Medicare and Medicaid Services;
and the CENTERS FOR MEDICARE AND
MEDICAID SERVICES,
                          Defendants.

Case No.:

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Children's Hospital of The King's Daughters, Incorporated ("CHKD" or "Plaintiff") seeks declaratory and injunctive relief against Defendants  Thomas Price, Patrick Conway, and the Centers for Medicare and Medicaid Services ("CMS" or "Defendants")  for violations of the Medicaid Act and the Administrative Procedure Act ("APA").  In support thereof, Plaintiff states as follows:

### INTRODUCTION

1.  Plaintiff CHKD is an independent, not-for-profit pediatric hospital, with its main campus located in Norfolk, Virginia.  CHKD is Virginia's only freestanding, full-service pediatric hospital and it serves children throughout southeastern Virginia, the eastern shore of Virginia, northeastern North Carolina, as well as children from throughout the United States and the

world, who come to CHKD for specialty care and for treatment of acute, life-threatening illnesses and injuries.  CHKD treats these critically ill children regardless of whether their families have health insurance or their families have the ability to pay for their care.

2.   CHKD has the region's only civilian Pediatric Intensive Care Unit for infants, children, and adolescents.  It operates the region's only level IV Neonatal Intensive Care Unit ("NICU"), with 62 beds for the most critically-ill newborns in the region, including those from military families and those transferred from lower level NICUs at other hospitals in Virginia.  CHKD has the region's only pediatric surgery program, which offers everything from pediatric outpatient procedures to the most complex orthopedic, neurosurgery, and cardiac surgeries.  CHKD is the primary teaching hospital and the home of the Eastern Virginia Medical School's Department of Pediatrics and its graduate residency training program in pediatrics.

3.   Plaintiff treats pediatric patients who are eligible to receive benefits from the Medicaid program, the medical assistance program established under  Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* (the "Medicaid Act").  The majority of the children who have inpatient stays at CHKD are eligible to receive Medicaid, due to either their financial circumstances or, simply, the severity of their illnesses.  In 2012, CHKD's Medicaid Inpatient Utilization Ratio ("MIUR"), which measures the total number of Medicaid inpatient days, divided by the total hospital days, was 69.65%.   For DSH year 2013, CHKD's MIUR was 71.21%.

4.   Congress  established the Disproportionate Share Hospital ("DSH") program under the Medicaid Act to help relieve the financial burden on certain hospitals that treat a disproportionate share of  Medicaid and uninsured patients.  42 U.S.C. § 1396r-4.   Under Virginia's State Medicaid Plan, Plaintiff qualifies to receive payments under the DSH program and has received millions of dollars in DSH funding.

2

5.   The DSH program helps relieve the financial burden borne by DSH hospitals by helping pay qualifying hospitals for the reimbursement shortfall associated with treating Medicaid and uninsured patients through payment adjustments.   42 U.S.C. § 1396r-4(g)(1)(A).   These payment adjustments may not exceed:  (1) the costs of services to individuals eligible for Medicaid, net of payments under the Medicaid Act (hereinafter the "Medicaid Shortfall"); plus (2) the costs of services to individuals who have no health insurance or other third-party coverage, net of payments by those uninsured patients.   *Id.*   The product of this statutory equation is known as a DSH hospital-specific DSH payment limit (commonly referred to as the "Hospital Specific Limit" or "HSL").   Only the first part of this statutory equation—the calculation of the Medicaid Shortfall—is at issue in this case.

6.   The Medicaid Act expressly provides that, to calculate a DSH hospital's Medicaid Shortfall, only Medicaid payments are to be subtracted from costs.   42 U.S.C. § 1396r-4(g)(1)(A).  CMS's regulations similarly specify that only Medicaid payments are to be considered in the Medicaid Shortfall calculation.   42 C.F.R. § 447.299(c)(16).

7.   Without notice-and-comment rulemaking under the Administrative Procedure Act ("APA"), CMS instituted and began for the first time enforcing a so-called "policy clarification" to the regulations contained in 42 C.F.R. § 447.299.  This "policy clarification" appeared in a January 2010 document responding to frequently asked questions ("FAQ") called, "Additional Information on the DSH Reporting and Audit Requirements" posted on Defendant CMS's website.[1]  The "policy clarification" at issue in this Complaint was set forth in response to question numbered 33 (hereinafter referred to as "FAQ 33").

---

[1] Available at https://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/part-1-additional-info-on-dsh-reporting-and-auditing.pdf (last visited February 21, 2017).

610447753.2

8.  FAQ 33 stipulated that DSH hospitals must include in the calculation of their  Medicaid Shortfall third party, non-Medicaid payments, principally private health insurance, for Medicaid eligible patients.

9.  Because 42 U.S.C. § 1396r-4(g)(1)(A) and 42 C.F.R. § 447.299(c)(16) unambiguously require that only Medicaid payments be contained  in the Medicaid Shortfall calculation, the "policy clarification" set forth in FAQ 33 constitutes a substantive amendment to the statute, and the regulations.  This substantive amendment is contrary to Congress's intent in enacting the Medicaid Act, and is an illegal interpretation of the Medicaid Act.  Moreover, the substantive amendment was not promulgated using notice-and-comment rulemaking under the APA.

10.      Two federal district courts have ruled on the legality of FAQ 33—and one of those courts has issued a permanent injunction—against Defendants from administering, enforcing or implementing FAQ 33. The other court has issued a preliminary injunction and its ruling on the merits is pending.

11.      On March 3, 2017, the United States District Court for the District of New Hampshire (McCafferty, J.) in *New Hampshire Hospital Association v. Burwell*, No. 15-cv-460, ECF No. 51 (Slip. Op.)  (D. N.H. Mar. 2, 2017) granted summary judgment for plaintiffs, permanently enjoining Defendants from enforcing FAQ 33 and ordering that "Defendants shall follow the policies and procedures in effect before" FAQ 33. The court ruled that in promulgating FAQ 33 as an FAQ on CMS's website, rather than as a regulation, Defendants acted "in excess of statutory interpretation, authority…or short of statutory right" and thus, Defendants were permanently enjoined from enforcing FAQ 33.  *Id.* at 34-35.  The court also ruled that FAQ 33 is a substantive rule that should have been, but was not, promulgated through notice-and-comment rulemaking under the APA.  *Id*. at 39.  Because it was not enacted with

4

notice-and-comment rulemaking, the court ruled that FAQ 33 constitutes agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and enjoined Defendants from enforcing it.  *Id.*

12.     On December 29, 2014, the United States District Court for the District of Columbia (Sullivan, J.) preliminarily enjoined the Defendants "from enforcing, applying, or implementing FAQ No. 33."  *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 247 (D.D.C. 2014).  In that case, the district court found that the plaintiffs had shown a likelihood of success on the merits of their claim that the policy referenced in FAQ 33 relating to private health insurance payments made "a substantive change to the formula for calculating a hospital's DSH limit," constituted final agency action, and had not been promulgated using the notice-and-comment provisions of the APA.  *Id.* at 241.  Summary judgment is pending.

13.     Despite these unambiguous federal district court orders, Defendants continue to apply, enforce and implement the policy of FAQ 33 relating to the inclusion of private health insurance payments in the calculation of a DSH Medicaid Shortfall in all jurisdictions (including Virginia) except those few states where the two district court orders are in force.

14.     On May 1, 2015, Defendant CMS wrote the Director of Missouri Health Net stating CMS's position on the applicability of FAQ 33.  CMS wrote that "in Texas and Washington … the enforcement of FAQ 33 is enjoined and that CMS will take no action to recoup any federal DSH funds provided to Texas and Washington based on a failure of those two states to take action consistent with the interpretation contained in FAQ33.  For all other states … CMS may disallow federal financial participation if a state does not comply with the policy articulated in FAQ 33."

15.     Because of the illegal application of FAQ 33, CHKD faces the imminent and irreparable loss of over $27.2 million of DSH funds.  The $27.2 million at imminent risk consists of $19.1 million in DSH funds already received for 2013, which is subject to immediate recoupment, and $8.1 million in DSH funds that CHKD expected to receive in 2017, which has now been reduced to zero.

16.     In addition, because of the illegal application of FAQ 33, CHKD expects DSH payments received for 2011 and 2012 exceeding $32.3 million to be recouped, as soon as 2017. DSH funds CHKD received in 2014, 2015, and 2016, totaling $25.3 million, will also be subject to recoupment once those audits are complete.

17.     Because of the illegal application of FAQ 33, CHKD will lose approximately $76.8 million of DSH funding already received for 2011-2016.

18.     Application of the illegal policy referenced in FAQ 33 will also eliminate millions of dollars in prospective DSH funding Plaintiff is entitled to receive in 2017 and future years. This is already occurring.  As referenced above, in 2017, CHKD was expected to receive approximately $8.1 million for DSH.  In January 2017, however, Myers and Stauffer, the state DSH auditor, notified CHKD that its prospective DSH payment for 2017 would be zero.  CHKD understands from the Virginia Department of Medical Assistance Services ("DMAS") that this is due to the application of FAQ 33.  Under FAQ 33's policy, any DSH funds DMAS provides to CHKD would eventually be subject to recoupment.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 704-706, as this action presents a case and controversy under the Medicaid Act, the APA, and  the Declaratory Judgment Act, 28 U.S.C. § 2201.

6

20.     Venue lies in this district under 28 U.S.C. § 1391 in that Defendants Price and

Conway are officers and employees of a United States agency, Plaintiff resides in Virginia, and

no real property is involved in the action.  Venue also lies in this district under 5 U.S.C. § 703

because there is no special statutory procedure for appeal and this court is a court of competent

jurisdiction.

## THE PARTIES

21.     Plaintiff CHKD is an independent, not-for-profit pediatric hospital, with its main

campus located in Norfolk, Virginia.  CHKD is Virginia's only freestanding, full-service

children's hospital and it serves children throughout southeastern Virginia, the eastern shore of

Virginia, northeastern North Carolina, as well as children from throughout the United States and

the world, who come to CHKD for specialty care and for treatment of acute, life-threatening

illnesses and injuries.  CHKD treats these critically ill children regardless of whether their

families have health insurance or their families have the ability to pay for their care.

22.     Plaintiff qualifies to participate in the DSH Program as a hospital that serves a

disproportionate number of Medicaid and uninsured patients.  Defendants' illegal actions,

requiring the miscalculation of uncompensated costs Plaintiff incurs annually in treating such

patients, deprives Plaintiff of statutorily authorized DSH Payments totaling millions of dollars

each year.

23.     Defendant Thomas E. Price is the United States Secretary of Health and Human

Services.  Defendant Price, by and through his designees at CMS, undertook the illegal and

unauthorized actions challenged in this case and has withheld the administrative action plaintiff

has requested to be taken.  Defendant Price is sued solely in his official capacity.

7

24.     Defendant Patrick Conway is the Acting Administrator of CMS.  CMS is the

agency that administers the Medicaid program and the DSH program.   Defendant Conway is

sued  solely in his official capacity.

25.     Defendant CMS is the federal agency to which Defendant Price has delegated  the

authority pursuant to the Social Security Act, 42 U.S.C. §§ 1396a(13)(A)(iv), 1396r-4(a)(1)(B), to

administer the Medicaid and DSH programs.

## STATUTORY AND REGULATORY FRAMEWORK

### A. Virginia Participates in the Federal Medicaid Program and Must Rigidly Comply with Federally Imposed Medicaid Requirements

26.     The Medicaid program was established in 1965 as a cooperative venture between

the federal and state governments to assist states in providing medical care to eligible

individuals.  42 U.S.C. § 1396 *et seq.*  It is designed to provide medical assistance to persons

whose income and resources are insufficient to meet the costs of necessary care and services.

27.     States are not obligated to participate in Medicaid, but must rigidly comply with

federally imposed requirements if they opt to participate.

28.     Virginia participates in Medicaid and DMAS administers Virginia's Medicaid

program.

29.     Each state administers its own Medicaid program pursuant to a state Medicaid

plan which must be reviewed and approved by the Secretary of HHS ("State Plan").  42 U.S.C.

§§ 1396, 1396a.  Upon approval of the plan, a state becomes eligible to receive federal matching

funds, or "federal financial participation" ("FFP") for a percentage of the amounts expended, as

medical assistance under a State Plan.  42 U.S.C. § 1396b(a)(1).

30.     Defendant CMS reviews Medicaid expenditures by the states to determine

whether they are allowable under the Medicaid Act and the State Plan, and whether the

appropriate federal matching payment has been claimed for such expenditures. If Defendant

CMS finds that a state expenditure was not allowable under federal policy, it will disallow it and

take action to recoup the federal dollars used for the disallowed expenditure. 42 U.S.C.

§ 1316(e).

**B. Congress Did Not Permit the Subtraction of Private Insurance Payments in the Medicaid Act to Determine a Hospital's Medicaid Shortfall under the Disproportionate Share Hospital Program**

31.     In 1981, Congress established the DSH Program to require that all states

participating in the federal Medicaid program provide supplemental Medicaid payments (DSH

Payments) to hospitals that serve large numbers of Medicaid and other low-income patients with

special needs. Pub. L. No. 97–35, § 2173(B)(ii), 95 Stat. 357 (codified at 42 U.S.C.

§ 1396a(13)(A)(iv)). Congress's intent was to stabilize the hospitals financially and preserve

access to health care services for eligible low-income patients.

32.     Congress acknowledged that hospitals serving more than their share of

low-income patients with special needs are "an essential element of the Nation's health care

delivery systems" because they serve so many of the "patients who other providers view as

financially undesirable"—patients who are poor, uninsured, or reliant on Medicaid for their

health care. H.R. Rep. No. 100-391(I) at 524-25 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2313-

268, 2313-344, 1987 WL 61524. Thus, Congress established the DSH Program to "assist these

facilities in surviving the financial consequences of competition in the health care marketplace,"

where they must compete with facilities that do not bear these high uncompensated costs. *Id.*

33.     Congress expressly referenced children's hospitals as examples to whom DSH

payments should be made based on "the proportion of low-income and Medicaid

patients…served by such hospitals." 42 U.S.C. § 1396r-4 (a)(2)(D).

34.      The Medicaid Act requires that, in determining Medicaid payment rates, states must "take into account . . . the situation of hospitals which serve a disproportionate number of low-income patients with special needs," 42 U.S.C. § 1396a(a)(13)(A)(iv), and provide an "appropriate increase" in Medicaid payments for hospital services provided by DSH Hospitals. 42 U.S.C. § 1396r-4(a)(1)(B).

35.      A hospital specific limit ("HSL") is the maximum DSH Payment a qualifying DSH Hospital may receive annually.  The Medicaid Act prescribes that the HSL may not exceed the amount of that hospital's "uncompensated costs" of serving Medicaid and low-income patients.  42 U.S.C. § 1396r-4(g)(1)(A).

36.      For purposes of the DSH Program, the Medicaid Act sets forth the precise formula for determining "uncompensated costs" as:

> [T]he costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section, and by uninsured patients) by the hospital to individuals who either are eligible for medical assistance under the State plan or have no health insurance (or other source of third party coverage) for services provided during the year.

42 U.S.C. § 1396r-4(g)(1)(A).

37.      Two categories of "uncompensated costs" are eligible for DSH reimbursement under the Medicaid Act:  (1) the costs of services to Medicaid patients (the Medicaid Shortfall component), and (2) the costs of services to uninsured patients (the uninsured component).  Only the calculation of the Medicaid Shortfall component is at issue in this case.

38.      Title 42 U.S.C., Section 1396r-4 (g)(1)(A) does not reference private health insurance payments in the Medical Shortfall component of "uncompensated costs."

39.      To ensure that the hospital-specific DSH payment limit has been calculated correctly for each DSH hospital, each state must provide an annual report and audit of its DSH program  to Defendant CMS.  42 U.S.C. § 1396r-4(j).  This annual report must include:

10

A. An identification of each disproportionate share hospital that received a payment adjustment under this section for the preceding fiscal year and the amount of the payment adjustment made to such hospital for the preceding fiscal year.

B. Such other information as the Secretary determines necessary to ensure the appropriateness of the payment adjustments made under this section for the preceding fiscal year.

**C. The Final Regulation Promulgated by CMS Does Not Permit the Subtraction of Private Insurance to Determine a Hospital's Medicaid Shortfall under the Disproportionate Share Hospital Program**

40.　　　In 2005, Defendant CMS issued a proposed rulemaking to implement the reporting and auditing requirements.  70 Fed. Reg. 50,262 (Aug. 26, 2005).  After notice and comment, on December 19, 2008, Defendant CMS finalized the rule, effective January 19, 2009.  73 Fed. Reg. 77,904 (Dec. 19, 2008) ("2008 Final rule").

41.　　　The 2008 Final Rule requires state annual reports to "present a complete, accurate, and full disclosure of all of their DSH programs and expenditures."  42 C.F.R. § 447.299(a).

42.　　　It further requires states to submit information "for each DSH hospital to which the State made a DSH payment."  42 C.F.R. § 447.299(c).

43.　　　The 2008 Final Rule is consistent with the Medicaid Act.  It defines "uncompensated care costs" as:

> [T]he total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals . . . *less the sum of regular Medicaid FFS rate payments, Medicaid managed care organization payments, [and] supplemental/enhanced Medicaid payments*[.]

42 C.F.R. § 447.299(c)(16) (emphasis added).

44.　　　42 C.F.R. § 447.299(c)(16) does not reference private insurance or any third party payments in determining "uncompensated costs."

45.     To verify the accuracy of these state annual reports, states must employ an independent auditor to audit the state's compliance with the federal DSH program.   42 U.S.C. § 1396r-4(j).

46.     These independent audits must verify, *inter alia*, that DSH payments made to each hospital comply with the applicable hospital-specific DSH payment limit.  42 U.S.C. § 1396r-4(j)(2).

47.     Any "overpayments" that the audit reveals "must be recouped by the state within one year of their discovery or the federal government may reduce its future contribution." *Texas Children's Hosp.*, 76 F. Supp. 3d at 230 (citing 42 U.S.C. § 1396b(d)(2)(C), (D)).

### D. CMS's Guidance Does Not Permit the Subtraction of Private Insurance Payments in Determining a Hospital's Medicaid Shortfall under the Disproportionate Share Hospital Program

48.     CMS has also developed guidance to help states understand how the hospital-specific  DSH payment limit must be calculated.  *See* General DSH Audit and Reporting Protocol, CMS- 2198-F [2] ("Guidance").  This document provides the following specific guidance for the auditor with  respect to calculating the Medicaid Shortfall:

> To determine the existence of the Medicaid shortfall, Medicaid IP/OP hospital costs (including Medicaid managed care costs) must be measured against Medicaid IP/OP revenue received for such services in the audited State Plan rate year (including regular Medicaid rate payments, add-ons, supplemental and enhanced payments and Medicaid managed care revenues).

*Id.* at 3.

49.     The Guidance does not reference private health insurance payments.

50.      The Guidance provides a step-by-step guide to determine a hospital's  hospital-specific DSH payment limit.  *Id.* at 5-10.

---

[2] Available at https://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/general_dsh_audit_reporting_protocol.pdf (last visited February 21, 2017).

610447753.2

51.     Step 7 of this step-by-step guide specifies the payments that must be taken into account in calculating the Medicaid Shortfall component of the hospital-specific DSH payment limit.  The Guidance specifies in part:  "Hospital[s] report revenues from Medicaid managed care organizations,  Medicaid payments from other States (regular payments including add-ons, supplemental and  enhanced payments, DSH payments), and other non-State Medicaid payments."

52.     Step 7 does not reference private health insurance payments.

53.     CMS has also developed a form to be used to help calculate the hospital-specific DSH payment limit.  *See* Definition of Uncompensated Care.[3]

54.     This form does not have data input columns for private health insurance.

**E. The Administrative Procedure Act**

55.     The APA prescribes the procedures federal agencies are required to follow in promulgating rules.  A "rule" under the APA is defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4).  "Rule making" is the "agency process for formulating, amending, or repealing a rule."  *Id.* § 551(5).

56.     Section 4 of the APA, *id.* § 553, governs the process of agency rulemaking.  Section 4(b) provides that "[g]eneral notice of proposed rulemaking shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof."  *Id.* § 553(b).  Section 4(c), in turn, provides that, if "notice [is] required by this section," the agency, after giving such notice, "shall give interested persons an opportunity to participate in the rule making through submission of written

---

[3] Available at https://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/dshreportformat.pdf  (last visited February 21, 2017).

[comments]" and consider those comments before adopting the rule.  *Id.* § 553(c).  These notice

and comment procedures are required for substantive agency actions that have the force and

effect of law.

57.      Section 706(2) of the APA requires a reviewing court to "hold unlawful and set

aside" agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in

accordance with law [or] without observance of procedure required by law."  5 U.S.C.

§ 706(2)(A), (D).

### CMS'S UNLAWFUL FAQ 33

58.      Medicaid enrollment is available not only to low-income individuals, but also,

regardless of family income, to all children born weighing less than 1200 grams, and to children

with severe anomalies, heart ailments, cancer, and other long-term and severe illnesses, as well

as those with special health care needs and disabilities, including children with significant

musculoskeletal and neurological conditions.  Because Plaintiff serves many low birthweight,

very sick and/or medically fragile children with special health care needs and disabilities,

Plaintiff has an unusually large number of patients who meet the qualifying criteria for Medicaid

eligibility for reasons other than income status.

59.      Medicaid does not pay for the inpatient or outpatient hospital care of Medicaid-

eligible patients that are covered by private health insurance.

60.      On or about January 10, 2010, CMS posted answers to "frequently asked

questions" regarding the federal audit and reporting requirements.  *See* Additional Information

on the DSH Reporting and Auditing Requirements.[4]   Question Number 33, and CMS's response

thereto, states:

> **33. Would days, costs, and revenues associated with patients that have both Medicaid and private insurance coverage (such as Blue Cross) also be included in the calculation of . . . the DSH limit in the same way States include days, costs and revenues associated with individuals dually eligible for Medicaid and Medicare?**
>
> Days, cost[s], and revenues associated with patients that are dually eligible for Medicaid and private insurance should be included in the calculation of the Medicaid utilization rate (MIUR) for the purposes of determining a hospital eligible to receive DSH payments. Section 1923(g)(1) does not contain an exclusion for individuals eligible for Medicaid and also enrolled in private health insurance. Therefore, days, costs, and revenues associated with patients that are eligible for Medicaid and also have private insurance should be included in the calculation of the hospital-specific DSH limit. As Medicaid should be the payor of last resort, hospitals should also offset both Medicaid and third party revenue associated with the Medicaid eligible day against the costs for that day to determine any uncompensated amount.

*Id.* at 18.

61.     Despite no reference to private health insurance in 42U.S.C. § 1396r-4(g)(1)(A),

42 C.F.R. § 447.299(c)(16), CMS's Guidance, or the form CMS has provided for the calculation

of the hospital-specific DSH payment limit, the policy contained in FAQ 33 is being applied by

CMS to require the inclusion of private health insurance in the calculation of the Medicaid

Shortfall component of the hospital-specific DSH payment limit.

62.     CMS' action in abruptly and substantively changing the requirements for the

calculation of the Medicaid shortfall component of Plaintiff's uncompensated care costs in

violation of the notice and opportunity for comment requirements of the APA has resulted in and

will continue to result in drastic reductions in the hospital-specific limits applied to Plaintiff and

the DSH payments it has and will receive.

---

[4]  Available at https://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/part-1-additional-info-on-dsh-reporting-and-auditing.pdf (last visited February 21, 2017).

15

## CHKD AND ITS CURRENT CIRCUMSTANCES

63.     Medicaid payments fall short of fully reimbursing CHKD for the actual costs it incurs in treating pediatric Medicaid patients.  Medicaid currently reimburses CHKD an average of only $0.69 for every dollar spent to provide care to pediatric Medicaid patients.

64.     CHKD sustains substantial financial losses from treating pediatric Medicaid patients.

65.     CHKD relies heavily on the DSH program to offset financial losses it suffers in treating a disproportionately high number of Medicaid patients.

66.     From 2011-2016, CHKD received approximately $76.8 million in total DSH funding.

67.     Under FAQ 33, this entire sum is at risk of recoupment.  Losing $76.8 million will significantly reduce the funding needed to sustain CHKD's mission and to fund annual investments in needed technology, care delivery equipment and general facilities required to provide essential pediatric services to the region.

68.     Prior to October of 2016, DMAS calculated CHKD's Medicaid Shortfall by adding the hospital's costs for providing Medicaid allowable services attributable to Medicaid patients for whom CHKD received Medicaid payments and then subtracting all Medicaid payments related to these costs (with the exception of a single patient in the audit of 2011 DSH funds).  During this time, DMAS collected data for all claims, including cost and payment data for patients who were Medicaid-eligible, but for whom no Medicaid payment was expected or paid because private insurance made payments on the claims.  Although this data was collected by DMAS, it was not used to calculate the HSL in the manner in which FAQ 33 instructs.

69.     In March 2016, DMAS informed CHKD that the injunction against enforcement of FAQ 33, imposed by the *Texas Children's Hospital* court, *Texas Children's Hosp. v. Burwell*,

16

76 F. Supp. 3d 224, 247 (D.D.C. 2014), did not apply in Virginia or states other than Texas and Washington, the states in which the two plaintiffs from *Texas Children's Hospital* are located. CHKD also learned from DMAS that CMS had instructed all other states (besides Texas and Washington) to apply the policy set forth in FAQ 33 for audits of the 2013 DSH year.

70.     In July 2016, the Virginia state auditor, Myers and Stauffer ("State Auditor"), informed CHKD that it was commencing an expanded desk review of CHKD's DSH survey for 2013.

71.     On August 18, 2016, the State Auditor informed CHKD that the preliminary results of the expanded desk audit showed a 2013 DSH "overpayment" for CHKD of $1.4 million.

72.     On October 4, 2016, the State Auditor informed CHKD that the State Auditor had incorrectly calculated CHKD's HSL by applying the private insurance payments received for Medicaid Eligible Only patient costs, only up to the amount of the Medicaid allowable cost (*i.e.*, what the Medicaid program would have paid, had the program been billed for the costs). The State Auditor indicated that it must now include the full amount of the private insurance payments because of FAQ 33.

73.     On October 4, 2016, the State Auditor revised the 2013 expanded desk audit result, misidentifying an "overpayment" for 2013 DSH of $19,167,660. This was the first time CHKD was aware of the extent to which FAQ 33 would adverse effect its DSH payments.

74.     On information and belief, DMAS has already submitted the 2013 audit results to CMS, identifying the $19,167,660 so-called "overpayment." FAQ 33 produced overpayments subject to recoupment contrary to Medicaid's definition of overpayments and how private insurance payments are accounted for under the Act. Under CMS regulations, DMAS has one

17

year from the time the "overpayment" was submitted to recoup the $19,167,660 "overpayment," before it loses its federal share of Medicaid DSH funding.

75.     By letter dated February 23, 2017, the State Auditor, on behalf of DMAS, again stated that the 2013 audit identified an "overpayment" of $19,167,660 and that CHKD has 33 days to submit payment or request a state administrative appeal.  CHKD thus faces the imminent threat of having to repay $19,167,660 because of the application of FAQ 33.

76.     The sole reason that a so-called "overpayment" for 2013 identified by the auditor is the inclusion of private health insurance payments for Medicaid eligible patients in CHKD's HSL.

77.     On January 31, 2017, CHKD received an email from the State Auditor indicating that the expanded desk audit it conducted on CHKD's 2013 DSH data caused the State Auditor to "go back and revise" the reports for DSH years 2011 and 2012.

78.     The State Auditor provided CHKD with a preliminary analysis identifying an "overpayment" of $14,744,658 for DSH year 2011, of which $4,929,454 was attributable to certain disallowed costs and has been repaid, resulting in a balance due of $9,815,204 and an "overpayment" of $18,681,928 for DSH year 2012.  The State Auditor gave CHKD one week to review its 2011 and 2012 calculations before it would "move forward with revising the reports."

79.     The sole reason that a so-called "overpayment" was recorded by the auditor for the 2012 audit is the inclusion of private health insurance payments for Medicaid eligible patients in the HSL calculation.  Regarding the 2011 audit, the sole reason that $9,815,204 was deemed an "overpayment" is the inclusion of private health insurance payments for Medicaid eligible patients in the HSL calculation (the remaining $4,929,454 of the "overpayment" was attributable to certain disallowed costs and has been repaid).

80.     If the State Auditor's preliminary report is confirmed, taking the "overpayments identified for DSH years 2011, 2012, and 2013, CHKD faces the certain recoupment of over $51.4 million for these three years.

81.     If nothing changes with the CMS methodology of including private health insurance payments for Medicaid eligible patients in the HSL, CHKD will have a negative HSL for audits of DSH years 2014, 2015, and 2016 and all the DSH funds received for those years will be marked as "overpayments" and subject to recoupment.  This amounts to a total of $25.3 million in "overpayments" subject to recoupment, once the audits are completed for 2014, 2015, and 2016.

82.     In total, CHKD is at risk of recoupment of over $76.8 million, for DSH years 2011-2016, because of the illegal application of the policy set forth in FAQ 33.

83.     Once recouped, CHKD has no legal recourse to recover these monies even if it fully prevails on the merits in this lawsuit because it could not recover money damages from the federal or state sovereigns.

84.     The harm to CHKD is the imminent and material reduction of funds available to it.  This reduction of available funds would directly impact CHKD's ability to continue to address current and unmet public health needs in and around its community.

85.     CHKD's impending loss of $19.1 million is an enormous loss for this non-profit regional pediatric safety-net hospital.  For example, $19.1 million would pay the full cost of 271 full time equivalent employees, which is 11.7% of hospital staffing.

86.     Being forced to repay $19.1 million in DSH funds received in 2013 coupled with not receiving $8.1 million in expected DSH funds in 2017 (a total loss of $27.2 million in 2017)

directly impacts CHKD's ability to address current and unmet public health needs in and around its community.

87.     For example, CHKD operates multidisciplinary pediatric outpatient facilities, urgent care health and surgery centers to ensure accessibility to all communities, including underserved populations in the region.  CHKD invests significant resources focused on increasing access to care by expanding its urgent care center locations that provide needed care at times when children would otherwise have to seek care from emergency rooms or go without care.  CHKD is also investing the necessary resources to qualify as a certified Level 1 pediatric trauma center; strengthen its pediatric cardiac surgery program; address the region's desperate shortage of quality mental health services for youth by recently establishing the region's outpatient behavioral health program; and building and expanding new facilities on the main campus and throughout the community to allow for better access to clinical care, research and residency training programs exclusively dedicated to children and provided only by CHKD in its region.

88.     CHKD's ability to continue investing in these services, including its ability to recruit and support the medical professionals and pediatric specialists essential to its patients, is directly impacted by the loss of these DSH funds.  In addition, CHKD has committed funding to increase access to clinical services, preventive care and community outreach programs for children, including psychiatry, psychology and behavioral health programs and *Healthy You for Life*, CHKD's comprehensive program aimed at decreasing rates of childhood obesity.

89.     CHKD also provides substantial funding to connect its sprawling community to its pediatric providers, recently establishing services by the creation of a telehealth program aimed at expanding access to care through a variety of technology-assisted means.  Furthermore,

CHKD recognizes its commitment to serving the most fragile and traumatized members of its pediatric community, operating a regional Child Abuse Program designed to accurately identify, treat and protect children who have been abused or neglected and invest in child abuse prevention programs.  CHKD's Child Abuse Program partners with law enforcement, the legal system and the military in every city it serves to obtain the information, interviews and examinations necessary through a process that recognizes the level of trauma experienced by children and their families and work to address and prevent child abuse.  The level of supportive services required to address the developmental, emotional, psychosocial, school and family resource needs of CHKD's patients is enormous.  At CHKD, this investment requires trained staff including physicians, nurses, allied health professionals, social workers, child life therapists, chaplains, educators, case managers, interpreters, dietitians, financial counselors, and patient advocates.  Many of these supportive services are not reimbursable by any payor, much less Medicaid, and are not sustainable absent the financial investment by CHKD.

90.     If Defendants continue to enforce FAQ 33, many of these supportive services are at risk of being adversely impacted, as CHKD looks at how to sustain these supportive pediatric services that are part of its community benefits mission, but non-reimbursable elements of the medical care provided. Simply stated, CHKD invests in its community and region by providing comprehensive pediatric services to enhance the lives of children, many of which are not reimbursable by the Medicaid program, but that are accessed and used by Medicaid and all pediatric patients and families. These are mission-critical initiatives that are funded by CHKD and used by the Medicaid program, but which are not reimbursed.

91.     The immediate loss of $27.2 million in 2017 ($19.1 million reported as an "overpayment" for 2013, which is in the process of being recouped, and the $8.1 million in

expected DSH funds for 2017, which will no longer be dispersed to CHKD) would threaten CHKD's ability to meet these mission-driven objectives.

92.     Once the reopened audits for 2011 and 2012 are finalized, CHKD will have additional "overpayments" exceeding $32.3 million, which could also be recouped in 2017, further harming CHKD's services and programs described above.

93.     In addition to the harm CHKD faces from the imminent and material reduction of funds already received, CHKD is also harmed by the elimination of *future* DSH funds, to which CHKD is lawfully entitled under statute.  On information and belief, as with 2017, DSH funds for future years will be zero, if the illegal policy in FAQ 33 is not enjoined, set aside, and vacated.

## COUNT I

### Violation of 5 U.S.C. § 706(2)(C)

94.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 93.

95.     The Medicaid Act unambiguously sets forth the calculation to be used in determining the Medicaid Shortfall component of the hospital-specific DSH payment limit.   42 U.S.C. § 1396r-4(g)(1)(A).

96.     The Medicaid Act expressly provides that only "payments under this subchapter" are to be subtracted from the total costs of furnishing hospital services to individuals who are eligible for medical assistance under the State Plan.  *Id.*   "[T]his subchapter" refers to the Medicaid Act.  *See id.*

97.     The policy referenced in FAQ 33 regarding the inclusion of private  health insurance in the calculation of the Medicaid Shortfall component  of the hospital-specific DSH

payment limit is contrary to the plain language of and unambiguous intent of Congress in enacting 42 U.S.C. § 1396r-4(g)(1)(A) and is an illegal implementation of the Medicaid Act.

98.     Section 706(2)(C) of the APA requires a reviewing court to "hold unlawful and set aside" agency action "in excess of statutory jurisdiction, authority, . . . or short of statutory right."  5 U.S.C. § 706(2)(C).

99.     In promulgating and enforcing the policy referenced in FAQ 33, the defendants acted in excess of their statutory jurisdiction, their statutory authority, and short of statutory right under the Medicaid Act.

100.     The policy referenced in FAQ 33 is therefore unlawful and should be vacated and set aside under 5 U.S.C. § 706(2)(C).

## COUNT II

### Violation of 5 U.S.C. § 706(2)(A), (D)

101.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 100.

102.     After notice-and-comment rulemaking, defendant CMS duly adopted regulations implementing the DSH program audit and reporting provisions of the Medicaid Act.  42 U.S.C. § 1396r-4; 42 C.F.R. Parts 447 and 455.  These regulations are unambiguous.   They expressly provide the methodology for calculating the Medicaid Shortfall component of a DSH's hospital-specific DSH payment limit as follows:  "the total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals . . . less the sum of regular Medicaid FFS rate payments, Medicaid managed care organization payments, supplemental/enhanced Medicaid payments, . . . ."   42 C.F.R. § 447.299(c)(16).

103.    Despite the existence of these unambiguous regulations, Defendant CMS, without notice or opportunity for comment, issued the policy referenced in FAQ 33 which requires the inclusion of private health insurance in the calculation of the Medicaid Shortfall component of a DSH's hospital-specific DSH payment limit.

104.    The policy referenced in FAQ 33 amends the unambiguous substantive language of 42 C.F.R. § 447.299(c)(16) and expands the footprint of that regulation by adding private health insurance payments to the calculation of the Medicaid Shortfall component of a DSH's hospital-specific DSH payment limit.  It also produces "overpayments" subject to recoupment contrary to Medicaid's definition of overpayments and how private insurance payments are accounted for under the Act.

105.    The policy referenced in FAQ 33 constitutes "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

106.    Defendants are enforcing the policy referenced in FAQ 33 by, among other things, requiring independent auditors to follow them in auditing states' compliance with the DSH program and requiring states other than New Hampshire, Texas and Washington to recoup any "overpayments" those policies create.

107.    Section 706(2)(A) of the APA proscribes agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Section 706(2)(D) of the APA proscribes agency action that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

108.  The policy referenced in FAQ 33 regarding the inclusion of private health insurance in the calculation of the Medicaid Shortfall component of a DSH's hospital-specific DSH payment limit has the force and effect of law.   As such, it is a legislative rule that substantively amends the

existing federal regulations without following the APA's notice-and-comment procedures. *See* 5 U.S.C. §§ 553(b)-(d).

109.  Thus, the policy referenced in FAQ 33 is arbitrary, capricious, an abuse of discretion, not in accordance with law, and constitutes agency action taken without observance of procedure required by law.  FAQ 33 should therefore be vacated pursuant to 5 U.S.C. § 706(2)(A), (D).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff CHKD respectfully requests this Court enter judgment in Plaintiff's favor, and

    a.  Declare that the policy referenced in FAQ 33 that requires the inclusion of private health insurance in the Medicaid Shortfall component of the DSH uncompensated care calculation is in excess of Defendants' statutory authority, or is short of statutory right and therefore is a violation of the APA;

    b.  Declare that the policy referenced in FAQ 33 that requires the inclusion of private health insurance in the Medicaid Shortfall component of the DSH uncompensated care calculation is not authorized by the Medicaid Act;

    c.  Declare that the policy referenced in FAQ 33 that requires the inclusion of private health insurance in the Medicaid Shortfall component of the DSH uncompensated care calculation is arbitrary, capricious and otherwise not in accordance with law and therefore violates the APA;

    d.  Declare that the policy referenced in FAQ 33 that requires inclusion of private health insurance in the Medicaid Shortfall component of a DSH's uncompensated care calculation has been imposed without observance of procedure required by law and therefore violates the APA;

e.  Preliminarily enjoin the Defendants from enforcing, applying, or implementing (or requiring states to enforce, apply, or implement) the policy referenced in FAQ 33 that requires inclusion of private health insurance in the Medicaid Shortfall component of a DSH's uncompensated care calculation;

f.  Vacate the policy referenced in FAQ 33 that requires inclusion of private health insurance in the Medicaid Shortfall component of a DSH's uncompensated care calculation;

g.  Order Defendants to notify the state Medicaid program in Virginia (administered by the Virginia Department of Medical Assistance Services) that, pending further order by the Court, that the enforcement of the policy set forth in FAQ 33 is enjoined, that FAQ 33 has no force and effect in Virginia, and that any "overpayments" previously identified for recoupment as a result of the policy set forth in FAQ 33 are not considered "overpayments" subject for recoupment.

h.  Grant Plaintiff such other relief as may be necessary and appropriate or as the Court deems just and proper.

Dated:  March 7, 2017

Respectfully submitted,

By:  /s/ Stephen E. Noona

Stephen E. Noona
Virginia State Bar No. 25367
Hunter W. Sims, Jr.
Virginia State Bar No. 09218

**Kaufman & Canoles, P.C.**
150 W. Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile: (888) 360-9092
senoona@kaufcan.com
hwsims@kaufcan.com

BAKER & HOSTETLER LLP

Geraldine E. Edens  (*application for pro hac admission to be filed*)
(D.C. Bar No. 437056)
Christopher H. Marraro  (*application for pro hac admission to be filed*)
(D.C. Bar No. 395152)
gedens@bakerlaw.com
cmarraro@bakerlaw.com

1050 Connecticut Avenue, NW
Washington, DC  20036-5304
Telephone:   (202) 861-1500
Facsimile:   (202) 861-1783

Susan Feigin Harris (*application for pro hac admission to be filed*)
(Texas Bar No. 06876980)
Email: sharris@bakerlaw.com
811 Main St. Suite 1100
Houston, Texas 77002
Telephone: 713.646.1307
Facsimile: 713.751.1717

*Attorneys for Plaintiff Children's Hospital of The King's Daughters, Incorporated*

27