UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division


CHILDREN'S HOSPITAL OF THE
KING'S DAUGHTERS, INC.,

        Plaintiff,


    v.                         ACTION NO. 2:17cv139


THOMAS E. PRICE,
SECRETARY, DEPARTMENT OF HEALTH
AND HUMAN SERVICES;

PATRICK CONWAY,
ACTING ADMINISTRATOR,
CENTERS FOR MEDICARE AND MEDICAID SERVICES;

and

CENTERS FOR MEDICARE AND MEDICAID SERVICES,

        Defendants.


## OPINION AND ORDER

This matter comes before the court on the Plaintiff's Motion for Emergency Injunctive Relief ("Motion"), ECF No. 7, and accompanying Memorandum in Support. ECF No. 8. The Plaintiff seeks to enjoin the Defendants' enforcement of FAQ 33, which would reduce a statutory payment adjustment to hospitals, like the Plaintiff, that serve a disproportionate share of Medicaid patients, and would force such hospitals to repay a portion of the payment adjustment from prior years. On March 23, 2017, the

court granted the Defendants' Unopposed Motion for Extension of Time. ECF No. 25. On March 31, 2017, the Defendants filed a Memorandum in Opposition to Plaintiff's Motion for Emergency Injunctive Relief ("Opposition"). ECF No. 26. On April 6, 2017, the Plaintiff filed under seal a Reply Supporting its Motion for Injunctive Relief ("Reply"). ECF No. 34. The parties appeared before the court on May 22, 2017, for oral argument. ECF No. 45. Following the hearing, the Plaintiff submitted a Supplemental Brief in Support of Motion for Preliminary Injunction ("Supplemental Brief"), ECF No. 47, and the Defendants submitted a Response to the Declaration of Dominic Patrick Madigan, ECF No. 46, and a Response to Plaintiff's Supplemental Brief in Support of Motion for Preliminary Injunction ("Response to Supplemental Brief"). ECF No. 50. On June 6, 2017, the court ordered the Defendants to not enforce FAQ 33 against the Plaintiff, until at least fourteen (14) days after the court rendered a decision on the Plaintiff's Motion. ECF No. 49.

## I. BACKGROUND

The Plaintiff is a not-for-profit pediatric hospital that has served the Norfolk, Virginia region for over 120 years. Ryan Decl. ¶¶ 2, 4. It is Virginia's only freestanding, full-service children's hospital that serves children from birth until age 21. Id. ¶ 2. Its Pediatric Intensive Care Unit is the region's only civilian critical care facility for infants, children, and

2

adolescents suffering from acute, life-threatening illnesses and injuries, and the Plaintiff offers the region's only level IV Neonatal Intensive Care Unit, pediatric emergency center, cancer and blood disorders program, child abuse program, and pediatric surgery program. Id. ¶ 3. A majority of the children who have inpatient stays are eligible for Medicaid. Compl. ¶ 3. The Plaintiff's Medicaid Inpatient Utilization Ratio ("MIUR") (the ratio of Medicaid inpatient days to total hospital days) was 69.65% in 2012 and 71.21% in 2013. Id.; see also Ryan Decl. ¶ 5. By contrast, in 2012 the second highest MIUR for Virginia general hospitals was only 41.99%. Ryan Decl. ¶ 5; Commonwealth of Virginia, Schedule of Annual Reporting Requirements for the Medicaid State Plan Rate Year Ended June 30, 2012, ECF No. 9-1.

Medicaid, 42 U.S.C. § 1396, et seq., is a cooperative federal-state program through which the federal government provides financial assistance to states, so that states can provide medical care to individuals who so qualify for financial assistance through the program. 42 U.S.C. § 1396; see Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 502 (1990). Medicaid's primary purpose is to provide "(1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain

3

or retain capability for independence or self-care." 42 U.S.C. § 1396-1. State participation is voluntary, but participating states must comply with various federal requirements in order to receive federal funds. <u>Wilder</u>, 496 U.S. at 502. Medicaid provides benefits to children with certain serious illnesses, without regard to their family's income, and about one in three children in the United States are covered by Medicaid. Ryan Decl. ¶¶ 5-6 (explaining that Medicaid covers babies weighing less than 1200 grams and children with severe anomalies, heart ailments, cancer, and significant musculoskeletal and neurological conditions); <u>see also</u> 42 U.S.C. §§ 1396a(cc), 1382c(a)(3)(C) (describing disability criteria for children).

The federal and state governments share the cost of Medicaid. States must establish "a scheme for reimbursing health care providers for the medical services provided to needy individuals." <u>Wilder</u>, 496 U.S. at 502. States submit the proposed plans to the Centers for Medicare and Medicaid Services ("CMS"), which must "make a determination as to whether it conforms to the requirements for approval." 42 U.S.C. § 1316(a)(1); <u>see also</u> <u>id.</u> § 1396a(b) (describing approval by the Secretary). If CMS approves the state's plan, the federal government provides reimbursement to the state for a portion of the cost of its Medicaid benefits and plan administration, and the state pays the remainder of its Medicaid expenses. <u>See</u> <u>id.</u>

4

§ 1396b. The Virginia Department of Medical Assistance Services ("DMAS") administers the Medicaid program in Virginia. See id. § 1396a(a)(5) (requiring states to establish or designate a state agency to "administer or to supervise the administration of the plan").

Congress amended the Medicaid Act in 1981 to ensure that payments to Medicaid-eligible hospitals took into account "hospitals which serve a disproportionate number of low-income patients with special needs." Id. § 1396a(a)(13)(A)(iv). Congress's intent "was to stabilize the hospitals financially and preserve access to health care services for eligible low-income patients." Va., Dep't of Med. Assistance Servs. v. Johnson, 609 F. Supp. 2d 1, 3 (D.D.C. 2009). The amendment created a "payment adjustment" for qualifying hospitals. 42 U.S.C. § 1396r-4(c). The payment adjustment is available to any hospital that treats a disproportionate share of Medicaid patients (a disproportionate share hospital or "DSH"). Id. § 1396r-4(d). The program was amended again in 1993 to include a hospital-specific limit ("HSL"), which stated that DSH payments may not exceed the:

> costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section, and by uninsured patients) by the hospital to individuals who either are eligible for medical

5

> assistance under the State plan or have no
> health insurance (or other source of third
> party coverage) for services provided
> during the year.

Id. § 1396r-4(g)(1)(A).[1] Accordingly, a DSH hospital's total uncompensated cost includes two parts: the cost of services to Medicaid-eligible individuals, net of payments under the Medicaid Act (the Medicaid shortfall); and the costs of hospital services to uninsured patients, net of payments by such patients (the uninsured component). See id. By statute, the Medicaid shortfall is calculated by subtracting Medicaid payments from the allowable expenses for eligible patients. See id.

Congress amended the Medicaid Act in 2003 to require that each state provide an annual report and audit of its DSH program. By statute, "[o]nly the uncompensated care costs of providing inpatient hospital and outpatient hospital services to individuals described in [Section 1396r-4(g)(1)(A)] are included in the calculation of the hospital-specific limits." Id. § 1396r-4(j)(2)(c). The state must recoup within one year any overpayments revealed by the audit, or the federal government may reduce its future contribution. Id. § 1396b(d)(2)(C).

On December 19, 2008, CMS promulgated a final rule (hereinafter the "2008 Rule") implementing the statutory

---

[1] "This subchapter" refers to Subchapter XIX, titled "Grants to States for Medical Assistance Programs." This Subchapter contains the Medicaid Act. See 42 U.S.C. § 1396.

reporting and auditing requirement. See Medicaid Program;
Disproportionate Share Hospital Payments, 73 Fed. Reg. 77904
(Dec. 19, 2008). The 2008 Rule requires that states annually
submit information "for each DSH hospital to which the State
made a DSH payment." 42 C.F.R. § 447.299(c). One such piece of
information is the hospital's "total annual uncompensated care
costs," defined in the regulation as:

> The total annual uncompensated care cost
> equals the total cost of care for
> furnishing inpatient hospital and
> outpatient hospital services to Medicaid
> eligible individuals and to individuals
> with no source of third party coverage for
> the hospital services they receive less
> the sum of regular Medicaid [fee-for-
> service] rate payments, Medicaid managed
> care organization payments,
> supplemental/enhanced Medicaid payments,
> uninsured revenues, and Section 1011
> payments.

Id. § 447.299(c)(16). Under the 2008 Rule, any audits of DSH
payments made prior to Fiscal Year 2011 would not result in the
recoupment or reduction of federal funds used for DSH payments.
See 73 Fed. Reg. at 77906, 77924.

On January 10, 2010, CMS posted on its website answers to
several "frequently asked questions" ("FAQs") regarding the 2008
Rule's audit and reporting requirements. See Additional
Information on the DSH Reporting and Auditing Requirement,
https://www.medicaid.gov/medicaid/financing-and-reimbursement/
downloads/part-1-additional-info-on-dsh-reporting-and-

7

auditing.pdf (last visited June 19, 2017). FAQ 33 is at issue in

this matter. FAQ 33 and CMS's response are as follows:

> **33. Would days, costs, and revenues associated with patients that have both Medicaid and private insurance coverage (such as Blue Cross) also be included in the calculation of the MIUR percentage and the DSH limit in the same way States include days, costs and revenues associated with individuals dually eligible for Medicaid and Medicare?**
>
> Days, cost, and revenues associated with patients that are dually eligible for Medicaid and private insurance should be included in the calculation of the Medicaid inpatient utilization rate (MIUR) for the purposes of determining a hospital eligible to receive DSH payments. Section 1923(g)(1) does not contain an exclusion for individuals eligible for Medicaid and also enrolled in private health insurance. <u>Therefore, days, costs, and revenues associated with patients that are eligible for Medicaid and also have private insurance should be included in the calculation of the hospital-specific DSH limit.</u> As Medicaid should be the payer of last resort, hospitals should also offset both Medicaid and third-party revenue associated with the Medicaid eligible day against the costs for that day to determine any uncompensated amount.

<u>Id.</u> at 18 (emphasis added). In short, FAQ 33 provides that in

calculating the hospital-specific DSH limit, a state must

subtract payments received from private health insurance.[2]

---

[2] The policy described in FAQ 33 was recently subject to notice-and-comment, published in the Federal Register, and adopted as a Final Rule. <u>See</u> Opp. at 29 n.9; <u>see also</u> Medicaid Program; Disproportionate Share Hospital Payments—Treatment of

The Plaintiff learned of FAQ 33 in 2014, but declares that it only became aware that FAQ 33 seriously jeopardized its funding in October 2016. Ryan Decl. ¶¶ 15, 23. By letter dated February 23, 2017, the Plaintiff was informed that it had thirty-three (33) days to repay $19.1 million in DSH payments. Letter from Johanna K. Linkenhoker, Senior Manager, Myers & Stauffer, to Beth Meinen, Reimbursement Manager, Children's Hospital of the King's Daughters (Feb. 23, 2017), ECF No. 9-9.

## II. PLAINTIFF'S INVOLVEMENT WITH MEDICAID

The Defendants argue that absent enforcement of FAQ 33, the Plaintiff inappropriately receives double payment for services rendered. See Opp. at 23 n.6. The Plaintiff argues that it is not being paid twice. Reply at 19. Understanding how Medicaid and private insurers pay the Plaintiff for patient services is essential to analyzing this dispute, because the DSH program is designed to provide supplemental payments to providers that serve a disproportionate Medicaid population, but would not allow providers to simultaneously bill both private insurers and

---

Third Party Payers in Calculating Uncompensated Care Costs, 82 Fed. Reg. 16114, 16122 (Apr. 3, 2017) (to be codified at 42 C.F.R. § 447.299(c)(10)). The revised regulation became effective on June 2, 2017. 82 Fed. Reg. at 16115. In a similar case in the District of Minnesota, see infra Section III, the defendants conceded that the final rule "would not have retroactive effect, and could only be applied prospectively." Defendants' Supplemental Brief, Children's Health Care v. Burwell, No. 16-cv-4064, ECF No. 73, at *4 (D. Minn. Apr. 14, 2017).

Medicaid for a particular service.

The Plaintiff's summary of its payment sources for its patients is instructive. See Exhibit 1, Supplemental Brief, ECF No. 47-1.[3] Medicaid makes payments on behalf of Medicaid-eligible children who lack private insurance (in the summary, "Medicaid-only children"). The actual cost of treating such children exceeds the Medicaid Allowable Cost for services rendered, and Medicaid pays the Plaintiff only a portion of the Medicaid Allowable Cost.[4] DSH payments are used to supplement these payments. On the other hand, private insurance pays the Plaintiff on behalf of Medicaid-eligible children who have private insurance (in the summary, "Medicaid-eligible children

---

[3] In relevant part, the summary provides as follows:

Loss Incurred Treating Children who are Direct Medicaid Beneficiaries (Not "Medicaid-Eligible" Children)

| Medicaid-Only Children | Actual Cost of Treatment | Medicaid Allowable Costs | Medicaid Payments | Private Insurance Payments | CHKD's Loss |
|---|---|---|---|---|---|
| 108.347 | $131 million | $109 million | $92.6 million | $ 0 | ($38.4 million) |

Costs of Treating "Medicaid-Eligible" Children With Private Insurance

| Medicaid-Eligible Children With Insurance | Actual Cost of Treatment | Medicaid Allowable Costs | Medicaid Payments | Private Insurance Payments | Amount Over Cost of Treatment |
|---|---|---|---|---|---|
| 2.199 | $23.6 million | $20.6 million | $ 0 | $33.7 million | $10.1 million |

[4] The Defendants argue that the Plaintiff has failed to explain the basis for its "actual" costs. Resp. to Supplemental Brief at 3-4. But the Defendants do not connect this objection to the precise issue before the court, namely whether private insurance proceeds can be used to reduce the Plaintiff's DSH payment.

with insurance"), because Medicaid is a payor of last resort. See VA. CODE § 32.1-325.2(B). While the actual cost of treating such children exceeds the Medicaid Allowable Cost for services rendered, Medicaid does not pay the Plaintiff for any services to these Medicaid-eligible children. In reality, the Medicaid Allowable Cost for services to these Medicaid-eligible children has no direct impact on payments made on behalf of such children, because Medicaid is not billed for their care and does not pay for their care. Instead, private insurance pays on their behalf. While the private insurance payments to the Plaintiff exceed the Medicaid Allowable Cost and the actual cost of treatment of such patients, Medicaid plays no role in paying for their care. Supplemental Brief at 4 n.1.

In short, the Plaintiff treats two groups of children: those whose care is paid for by Medicaid, who do not pay with private insurance funds; and those whose care is paid for by private insurance, who do not pay with Medicaid. The two groups do not overlap. Accordingly, under no circumstances is a patient's care paid for by private insurance and Medicaid. See id. at 4. Even the sum of Medicaid payments, the DSH payment, and proceeds from private insurers does not exceed the Plaintiff's actual cost of treatment for all Medicaid-eligible patients. See Exhibit 1, Supplemental Brief. Importantly, the Plaintiff's DSH payment is calculated by adding the Medicaid

11

shortfall to the uninsured component, and the calculation does not include costs for Medicaid-eligible patients who have private insurance. See Ryan Decl. ¶¶ 32-33 ($19,167,660 DSH payment represents the sum of $16.4 million Medicaid shortfall and $2.7 million uninsured component).

It is true that private insurance payments on behalf of children who have such insurance exceeds the Medicaid Allowable Cost of their care. The Defendants seek to subtract that overage from the Plaintiff's DSH payments. As described above, they cannot claim to do so in an attempt to prevent Medicaid and a private insurer from paying for the same person's treatment, as this is not the case. Instead, they argue that the statute permits such a policy.

### III. SIMILAR LITIGATION

Several federal courts have considered the validity of FAQ 33 under circumstances similar to those presented here. CMS has apparently taken the position that a court's injunction is binding only within that court's jurisdiction, and is attempting to enforce FAQ 33 in districts where no injunction has been issued. See E-mail from William Lessard, DMAS, to Dennis Ryan, Senior Vice President of Finance and Chief Financial Officer, Children's Hospital of the King's Daughters, Inc. (Mar. 4, 2016, 08:03), ECF No. 9-2 ("CMS has instructed other states that they should apply its current guidance (reflected in FAQ 33 on

12

private insurance). Until it is finally resolved in court, we will continue to apply FAQ 33.").

On December 5, 2014, two DSH hospitals brought suit to enjoin enforcement of FAQ 33. Tex. Children's Hosp. v. Burwell, 76 F. Supp. 3d 224, 235 (D.D.C. 2014). The hospitals made much the same arguments here asserted by the Plaintiff, namely that FAQ 33 "was promulgated in violation of the Administrative Procedure Act and that it is contrary to the Medicaid Act." Id. at 236. The court granted the plaintiffs' motion for a preliminary injunction. Id. at 247.

On January 15, 2016, several hospitals and a non-profit trade group brought suit to enjoin enforcement of FAQ 33. See N.H. Hosp. Ass'n v. Burwell, No. 15-cv-460-LM, 2016 WL 1048023, at *5 (D.N.H. Mar. 11, 2016).[5] The plaintiffs made substantially the same arguments presented here and in Texas Children's Hospital, namely that FAQ 33 was "contrary to the plain language of the Medicaid Act and w[as] promulgated in violation of the APA." Id. at *6. The court granted the plaintiffs' motion for a preliminary injunction. Id. at *19. The court later granted the plaintiffs' motion for summary judgment on the two counts that are substantially similar to those presented here. N.H. Hosp. Ass'n v. Burwell, No. 15-cv-460-LM, 2017 WL 822094, at *16

---

[5] The plaintiff also sought to enjoin enforcement of FAQ 34, which is not at issue in this case.

13

(D.N.H. Mar. 2, 2017) (granting summary judgment on counts alleging that FAQ 33 is in excess of the authority granted under the Medicaid Act, and should have been promulgated by notice-and-comment rulemaking).

A third court recently issued an order enjoining the government from enforcing FAQ 33 and from recouping any DSH funds until at least fourteen (14) days after the court rendered a decision on the plaintiffs' motion for a preliminary injunction and summary judgment. See Order Modifying Briefing and Hearing Schedule and Consolidating Motion for Preliminary Injunctive Relief with the Merits, Children's Health Care v. Burwell, No. 16-cv-4064, ECF No. 30, at *2 (D. Minn. Jan. 4, 2017). Upon the parties' request, the District of Minnesota court ordered the parties to file supplemental briefing on the implications of the new finalized rule issued by CMS.[6] Order, Children's Health Care v. Burwell, No. 16-cv-4064, ECF No. 69 (D. Minn. Apr. 3, 2017). The plaintiffs proposed filing an amended complaint that addressed the final rule. Plaintiffs' Supplemental Memorandum, Children's Health Care v. Burwell, No. 16-cv-4064, ECF No. 71, at *1 (D. Minn. Apr. 7, 2017). The defendants argued that the court should simply "deem[] the [c]omplaint amended" to include a challenge to the final rule,

---

[6] The new finalized rule is the one identified by the Defendants. See supra note 2.

14

that there was "no need for additional briefing," and that the court "should resolve the cross-motions for summary judgment in due course and absent further proceedings." Defendants' Supplemental Brief, Children's Health Care v. Burwell, No. 16-cv-4064, ECF No. 73, at *5, *7, *9 (D. Minn. Apr. 14, 2017). The court ultimately decided that its "resolution of the pending cross-motions for summary judgment will remain limited to [p]laintiffs' challenge to FAQ 33." Order, Children's Health Care v. Burwell, No. 16-cv-4064, ECF No. 74 (D. Minn. Apr. 20, 2017). The court stated that the plaintiffs "must formally amend their complaint" in order to challenge the final rule. Id.

### IV. ANALYSIS

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. at 20. Each preliminary injunction factor must be satisfied for an injunction to issue. Pashby v. Delia, 709 F.3d 307, 320-21 (4th Cir. 2013). Each factor must be demonstrated by a "clear showing." Winter, 555 U.S. at 22. The decision to grant a preliminary injunction is within the court's sound discretion.

15

See id. at 24; Hughes Network Sys., Inc. v. InterDigital Comm'ns Corp., 17 F.3d 691, 693 (4th Cir. 1994).

### A. Likelihood of Success on the Merits

A plaintiff must make a "clear showing" that it is likely to succeed on the merits, but need not show a certainty of success. Pashby, 709 F.3d at 321. Here, the Plaintiff alleges that FAQ 33 is contrary to the text of the Medicaid Act and was promulgated in violation of the APA, and that FAQ 33, therefore, cannot support the recoupment of the funds in question. Mem. Supp. at 15. Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," id. § 706(2)(A), or "without observance of procedure required by law." Id. § 706(2)(D).

### 1. Final Agency Action Requirement

This court must first determine whether the Plaintiff may challenge FAQ 33. The APA "does not provide judicial review for everything done by an administrative agency." Invention Submission Corp. v. Rogan, 357 F.3d 452, 459 (4th Cir. 2004) (quoting Hearst Radio v. FCC, 167 F.3d 225, 227 (D.C. Cir. 1948) (internal quotation marks omitted)). "Other than agency action made specifically reviewable by statute, § 704 limits the APA's

16

non-statutory right of judicial review to final agency action." Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA, 313 F.3d 852, 857 (4th Cir. 2002); see also 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). Agency action is final where it both marks "the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and is "one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted). By statute, agency action "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

"The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." Franklin v. Mass., 505 U.S. 788, 797 (1992). "In determining the finality of agency action a court should consider the practical effect of the [agency's] determination." Chamblee v. Espy, 100 F.3d 15, 17 (4th Cir. 1996) (alteration in original) (internal quotation marks omitted). "[A]gency action that merely reiterates or affirms an earlier agency decision and does not affect the

17

rights or alter the status quo of the complaining party is not considered a 'final agency action'[.]" Harris v. FAA, 215 F. Supp. 2d 209, 213 (D.D.C. 2002). A "statement by an agency that simply restates an established interpretation 'tread[s] no new ground' and 'le[aves] the world just as it found it, and thus cannot be fairly described as implementing, interpreting, or prescribing law or policy.'" Golden & Zimmerman, LLC v. Domenech, 599 F.3d 426, 432 (4th Cir. 2010) (alterations in original) (quoting Indep. Equip. Dealers Ass'n v. EPA, 372 F.3d 420, 428 (D.C. Cir. 2004)). "Indeed, '[j]ust as it would be folly to allow parties to challenge a regulation anew each year upon the annual re-publication of the Code of Federal Regulations, so too is it silly to permit parties to challenge an established regulatory interpretation each time it is repeated.'" Id. (alteration in original) (quoting Indep. Equip. Dealers Ass'n, 372 F.3d at 428).

Moreover, "[a]gency action which carries no 'direct and appreciable legal consequences' is not reviewable under the APA." Flue-Cured Tobacco, 313 F.3d at 859 (quoting Bennett, 520 U.S. at 178). To constitute final agency action, an "agency must have made up its mind, and its decision must have 'inflict[ed] an actual, concrete injury' upon the party seeking judicial review." Am. Tel. & Tel. Co. v. EEOC, 270 F.3d 973, 975 (D.C. Cir. 2001) (alteration in original) (quoting Williamson Cty.

18

Reg'l Planning v. Hamilton Bank, 473 U.S. 172, 193 (1985)). Agency action is non-reviewable where "the practical effect of the agency action is not a certain change in the legal obligations of a party." Nat'l Ass'n of Home Builders v. Norton, 415 F.3d 8, 15 (D.C. Cir. 2005).

Applying these principles here, FAQ 33 is not of a "tentative" or "interlocutory" nature, Bennett, 520 U.S. at 178, because it has existed since January 2010, and CMS has attempted to enforce it as written since at least 2011. See Tex. Children's Hosp., 76 F. Supp. 3d at 231-32 (Washington State Health Care Authority informed Seattle Children's Hospital of revised calculation methodology on June 15, 2011). It does not merely carry out an agency's prior decision, but implements a new approach to calculating the payment adjustment not found in either the Medicaid Act or the 2008 Rule.[7] Because of this incongruity, FAQ 33 is not merely a restatement or republication of an existing regulation or policy. Furthermore, FAQ 33 is not advisory, nor is it tentative or the ruling of a subordinate official. See Franklin, 505 U.S. at 797. CMS is using FAQ 33 to direct states to force providers to turn over millions of dollars. The practical effect of FAQ 33 is to submit the

---

[7] See infra Section IV.A.3 (contrasting FAQ 33 with the 2008 Rule).

Plaintiff to an entirely new legal regime governing the calculation of DSH payments.

The Defendants are using FAQ 33 as a legal tool to require the Plaintiff to repay millions of dollars that it received many years ago. FAQ 33 unambiguously imposes significant obligations on the Plaintiff. It does not contain a suggestion, advisory statement of law, or threat of future action. It is presently the legal basis for the Defendants' recovery from the Plaintiff of tens of millions of dollars. See Compl. ¶¶ 15-17; Ryan Decl. ¶¶ 25-27. The loss of this funding is likely to force the Plaintiff to terminate employees and eliminate important projects and programs. Harding Decl. ¶ 2. FAQ 33 plainly creates legal consequences and determines the Plaintiff's rights and obligations with respect to a substantial portion of its funding. See Bennett, 520 U.S. at 178. FAQ 33 imposes upon the Plaintiff an unfamiliar and unavoidable legal regime governing DSH payments. See id.

### 2. Authority Under the Medicaid Act

The Plaintiff argues that FAQ 33 violates § 706(2)(C) of the APA because it conflicts with the unambiguous language of the Medicaid Act. See Mem. Supp. at 19-20. In reviewing an agency's interpretation of a statute, a court must first determine "whether Congress has directly spoken to the precise question at issue." Chevron, U.S.A., Inc. v. Nat. Res. Def.

Council, Inc., 467 U.S. 837, 842 (1984). To do so, the court must employ "the traditional rules of statutory construction." Elm Grove Coal Co. v. Dir., O.W.C.P., 480 F.3d 278, 293 (4th Cir. 2007) (quoting Brown & Williamson Tobacco Corp. v. FDA, 153 F.3d 155, 162 (4th Cir. 1998)). Accordingly, the court must consider, among other things, "the overall statutory scheme [and] legislative history." Id. (quoting Brown & Williamson, 153 F.3d at 162) (internal quotation marks omitted). If Congress has spoken on the issue, the court must give effect to congressional intent. Chevron, 467 U.S. at 842-43. If the statute is silent or ambiguous on the issue, the court must determine "whether the agency's answer is based on a permissible construction of the statute." Id. at 843.

### a. Statutory Text

The Medicaid Act establishes the hospital-specific DSH limit, and defines the relevant shortfall as:

> the costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section, and by uninsured patients) by the hospital to individuals who either are eligible for medical assistance under the State plan or have no health insurance (or other sources of third party coverage) for services provided during the year.

42 U.S.C. § 1396r-4(g)(1)(A). It states only that Medicaid payments are to be subtracted from costs. Id. (referring to

21

"payments under this subchapter").[8] Congress elected to require that a provider subtract Medicaid payments from the HSL, but made no mention of deducting private insurance payments. This silence is significant. The court cannot assume that Congress has omitted from statutory text a requirement that it intended to apply, particularly where the same statute includes different requirements. See Jama v. Immigration & Customs Enforcement, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."). Accordingly, as relevant here, the statute is unambiguous: private insurance payments made on behalf of Medicaid-eligible children whose care is not billed to Medicaid cannot be used to reduce DSH payments made to compensate a provider for the costs of treating Medicaid patients. The distinction here is between Medicaid-eligible patients who are covered by private insurance and whose care is not billed to Medicaid, and Medicaid patients who are covered by, and whose care is billed to, Medicaid. Simply put, the former set of patients cannot be used to cover the costs associated with the latter set of patients in the manner the Defendants propose.

---

[8] See supra note 1.

The Defendants also believe that the DSH limit must be calculated based on the aggregate uncompensated Medicaid Allowable Cost of providing care to children covered by Medicaid, and children who have private insurance but are otherwise Medicaid-eligible, which would require that payments from private insurers be used to reduce the DSH payment. See Resp. to Supplemental Brief at 5 (citing 42 U.S.C. § 1396r-4(g)(1)). The Defendants find congressional intent to aggregate the costs and payments in this manner in the statute's reference to "individuals who . . . are eligible for medical assistance under the State plan." See id. at 5-6; 42 U.S.C. § 1396r-4(g)(1)(A). But the statutory provision makes no reference to aggregating the costs and payments for the groups described above in a way that accounts for private insurance.[9] Moreover, while some patients with private insurance might nominally be Medicaid-eligible, they cannot actually have their expenses paid by the state plan, because their private insurance is expected to cover their costs. See VA. CODE. § 32.1-325.2 (DMAS "shall be the payor of last resort," and where it has made payment that a third party should have, "the Commonwealth shall

---

[9] Nor does the legislative history of this provision, which refers only to subtracting payments received from Medicaid patients and uninsured patients, not Medicaid-eligible patients covered by private insurance. H.R. Rep. No. 103-213, at 835 (1993) (Conf. Rep.). Nor does the legislative history of related provisions, which described the DSH program. H.R. Rep. No. 108-391, at 808 (2003) (Conf. Rep.) (same).

automatically acquire all rights to such payment from the third party"). This ineligibility is not theoretical: Medicaid does not pay the Plaintiff where a patient has private insurance. See Exhibit 1, Supplemental Brief; Supplemental Brief at 4. Moreover, the Plaintiff's DSH payment only accounts for the Medicaid shortfall, and excludes costs from Medicaid-eligible patients with private insurance. See Ryan Decl. ¶¶ 32-33.

The Defendants argue that the statute's certification requirement envisions a DSH regime that only provides payment for uncompensated costs. Opp. at 17 (citing 42 U.S.C. § 1396r-4(j)(2)(C) (requiring that the audit verify that the HSL consider "[o]nly the uncompensated care costs")). However, the audit provision separately reaffirms the text of 42 U.S.C. § 1396r-4(g)(1)(A), which, as described above, does not contemplate subtracting private insurance proceeds from DSH payments. 42 U.S.C. § 1396r-4(j)(2)(B) (requiring that the audit verify "[p]ayments under this section to hospitals that comply with the requirements of subsection (g) of this section"). The audit requirement's endorsement of subsection (g) dissolves the objection that Congress, in enacting the audit requirement, intended to alter that subsection's payment scheme.

The statute, however, does grant the Secretary the authority to define "costs." See id. § 1396r-4(g)(1)(A) (referring to "the costs incurred . . . as determined by the

24

Secretary"). The Defendants, as in <u>New Hampshire Hospital</u>, argue that in this provision Congress delegated to the Secretary discretion to interpret "costs," and to decide how other payments should be treated. Opp. at 20-21; <u>N.H. Hosp. Ass'n</u>, 2016 WL 1048023, at *11-12. The <u>New Hampshire Hospital</u> court invoked <u>Chevron</u> step two to determine whether the Secretary's interpretation was reasonable, and concluded that it was not. <u>N.H. Hosp. Ass'n</u>, 2016 WL 1048023, at *11-14. This court concurs, and further notes that the statute's text unambiguously forecloses such a reading. The argument that the Secretary can define "costs" to include private insurance payments is inconsistent with Congress's decision to separately define payments to exclude private insurance payments. <u>See</u> 42 U.S.C. § 1396r-4(g)(1)(A). To allow costs to be defined in such a manner would render the Congressional definition of "payments" in the very same clause superfluous. <u>See</u> <u>United States v. Menasche</u>, 348 U.S. 528, 538-39 (1955) (court's "duty [is] 'to give effect, if possible, to every clause and word of a statute,' rather than to emasculate an entire section") (quoting <u>Inhabitants of Montclair Twp. v. Ramsdell</u>, 107 U.S. 147, 152 (1883)). The Medicaid Act cannot reasonably be read to include certain unspecified "payments" within "costs," while separately defining "payments."[10]

---

[10] Relatedly, the Defendants state that a cost is "incurred"

## b. Legislative History

The Defendants argue that FAQ 33 is authorized by the Medicaid Act because the relevant legislative history shows that Congress intended only to allocate DSH funds to supplement Medicaid costs for which no payment from any source had been received. See Opp. at 7. According to the Defendants, Congress established the HSL "in response to reports that some hospitals received DSH payment adjustments that exceeded 'the net costs, and in some instances the total costs, of operating the facilities.'" Opp. at 7 (quoting H.R. Rep. No. 103-111, at 211 (1993), reprinted in 1993 U.S.C.C.A.N. 378, 538). But in the surrounding text Congress provides essential context, and makes clear that it had two motivations in enacting the amendment. Neither is relevant here.

First, Congress was "concerned by reports that some States [were] making DSH payment adjustments to hospitals that do not provide inpatient services to Medicaid beneficiaries." H.R. Rep.

---

under the statute only if it is uncompensated from any source (before accounting for DSH payments). Opp. at 19. The Defendants argue that the legislative history of the statute "indicates that Congress intended that all payments made on behalf of Medicaid patients should be offset from costs, which would clearly include payments made by private insurance." Id. at 20. But the legislative history refers to subtracting "payments received from or on behalf of Medicaid and uninsured patients." H.R. Rep. No. 108-391, at 808. Here, there are no private insurance proceeds from actual Medicaid patients, only from nominally Medicaid-eligible patients who have private coverage. See supra Section II.

No. 103-111, at 211. Because the purpose of DSH payments "is to assist those facilities with high volumes of Medicaid patients in meeting the costs of providing care to the uninsured patients that they serve, since these facilities are unlikely to have large numbers of privately insured patients through which to offset their operating losses on the uninsured," the Committee "prohibit[ed] States from designating a hospital as a Medicaid disproportionate share hospital unless at least 1 percent of the facility's inpatient days are attributable to Medicaid patients." Id. Congress's first motivation is not implicated in this case, because it is uncontested that the Plaintiff serves a substantial Medicaid population. See Ryan Decl. ¶ 5 (Plaintiff's 2012 MIUR was 69.65%); Opp. at 6 ("There is no dispute that the plaintiff hospital in this case is eligible to receive DSH payments.").

Second, Congress was concerned by reports that in some states "excess Medicaid DSH payments [were] transferred to the State general fund, where they may be used to fund public health or mental health services, to draw down more Federal Medicaid matching funds, or to finance other functions of State government, such as road construction and maintenance." H.R. Rep. No. 103-111, at 211-12. Congress did not leave the public to imagine what it viewed as an impermissible use of Medicaid funds: "In the view of the Committee, use of Federal Medicaid

27

funds for unrelated purposes, such as building roads, operating correctional facilities, balancing State budgets, is a clear abuse of the program." Id. at 212. Here, there is no indication that the Plaintiff is part of a scheme to divert Medicaid funds toward impermissible state projects.

### c. Reference to "Uncompensated Costs"

The Defendants also find evidence of Congress's intent to ensure that DSH funds are used only to supplement costs for which no payment from any source had been received in the title of 42 U.S.C. § 1396r-4(g)(1). Opp. at 7, 17. The subsection's title is "Amount of adjustment subject to uncompensated costs." 42 U.S.C. § 1396r-4(g)(1) (emphasis added). Such a reading might make sense as a policy matter, but does not support the application of FAQ 33.

First, the statute's text is at odds with such a policy, because it does not allow the deduction of private insurance payments. Second, the pre-FAQ 33 policy does not result in the Plaintiff receiving a windfall in excess of the actual cost of its Medicaid care. Indeed, as described above, DSH payments are made to supplement a provider's losses from treating Medicaid patients. The loss a provider suffers because Medicaid reimbursements fall short of both the actual cost of treating Medicaid patients and the Medicaid Allowable Cost for such patients is no less of a loss merely because the provider

28

receives money from other sources for treating nominally Medicaid-eligible patients who have private insurance. This is particularly true because Congress has not provided for such a deduction. Income from other sources cannot transform an uncompensated cost into a compensated one. The actual cost of treating all Medicaid-eligible patients far exceeds the Plaintiff's Medicaid reimbursement, DSH payments, and private insurance payments for treating such patients. Ryan Decl. ¶¶ 9, 32-34. Third, the 2008 Rule defines "uncompensated care cost" without accounting for private insurance payments. 42 C.F.R. § 447.299(c)(16).

### 3. Notice-and-Comment Requirement

The Plaintiff asserts that FAQ 33 was implemented without notice-and-comment, in violation of §§ 706(2)(A) and (D) of the APA. See Mem. Supp. at 16. According to the Plaintiff, the 2008 Rule clearly provides for the calculation of the Medicaid shortfall without accounting for payments by private insurance:

> The total annual uncompensated care cost equals the total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals and to individuals with no source of third party coverage for the hospital services they receive less the sum of regular Medicaid [fee-for-service] rate payments, Medicaid managed care organization payments, supplemental/enhanced Medicaid payments, uninsured revenues, and Section 1011 payments.

42 C.F.R. § 447.299(c)(16) (emphasis added). The Plaintiff argues that FAQ 33 made a substantive change to the formula for calculating the hospital-specific DSH limit and imposes upon hospitals, for the first time, a requirement "that private insurance payments be included in the calculation of the DSH HSL." Mem. Supp. at 18.

Substantive rules are subject to notice-and-comment rulemaking. 5 U.S.C. § 553(d). Interpretative rules are not.[11] 5 U.S.C. § 553(b)(A); United Farm Workers, 702 F.3d at 771. Notice-and-comment is required where a rule has the force of law, as is the case where legal consequences follow. Manufactured Housing Institute v. EPA, 467 F.3d 391, 397, 399 (4th Cir. 2006). A regulation is interpretative, if it clarifies an ambiguous term found in the statute or explains how a provision operates, and will be upheld, if it implements Congress's mandate in a reasonable manner. Walton v. Greenbrier Ford, Inc., 370 F.3d 446, 452 (4th Cir. 2004).

Agency action is arbitrary and capricious if the agency considered "factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs

---

[11] Interpretative rules are only entitled to the deference articulated in Skidmore v. Swift & Co., 323 U.S. 134 (1944). N.C. Growers' Ass'n, Inc. v. United Farm Workers, 702 F.3d 755, 771 (4th Cir. 2012).

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view" or to the agency's expertise. Hughes River Watershed Conservancy v. Johnson, 165 F.3d 283, 287-88 (4th Cir. 1999). The court's inquiry "is to be searching and careful," but the court "is not empowered to substitute its judgment for that of the agency." Id. at 288.

FAQ 33 altered the formula for calculating the hospital-specific DSH limit, is binding on state Medicaid agencies, and effectively overrules the 2008 Rule by including in the amount excluded from payment any proceeds from private insurance. Even a strained reading of FAQ 33 and the 2008 Rule cannot reconcile the two. The 2008 Rule calculates "uncompensated care cost" by accounting for five different payment sources. See 42 C.F.R. § 447.299(c)(16). Private insurance is not among them. See id. The 2008 Rule accounts for payments for dual-eligible patients. 73 Fed. Reg. at 77912. The Defendants find in this provision, which requires an accounting of Medicare and Medicaid payments, a theory that requires the deduction of any private insurance funds. Opp. at 26. But the court cannot substitute the Defendants' interpretation for Congress's plain text and the agency's prior understanding, as reflected in the 2008 Rule.

31

FAQ 33 is final agency action that has been in place since 2010, has been enforced against multiple healthcare providers in several jurisdictions, and is not advisory. Accordingly, FAQ 33 is a substantive rule that should have been promulgated pursuant to notice-and-comment.

### B. Irreparable Harm

The Plaintiff must also establish that it will suffer irreparable harm absent a preliminary injunction. _Winter_, 555 U.S. at 20. According to the Defendants, the Plaintiff seeks a preliminary injunction merely to avoid a financial loss. Opp. at 13. But the Plaintiff is a not-for-profit children's hospital that provides critical services to children in Virginia and North Carolina, not a business seeking to preserve investor value. _See_ Ryan Decl. ¶ 2. The nature of the Plaintiff's enterprise means that financial hardship will cause enduring damage to the Plaintiff's short-term and long-term ability to provide care, and will cause irreversible harm to its patients and their families. Disrupting the Plaintiff's ability to provide medical treatment cannot be likened to interrupting a typical business's ability to turn a profit. The typical business can catch up on lost profits in the future, but a hospital cannot retroactively treat its patients.

The Plaintiff faces grave harm. Enforcement of FAQ 33 may cause the Plaintiff's operating margin to become negative for

the first time in fifteen (15) years. Harding Decl. ¶ 5. This would put the Plaintiff at risk of violating its bond covenants, which could force the Plaintiff to accelerate repayment of over $100 million in long-term debt, a financial catastrophe which would threaten the Plaintiff's existence. Id. ¶ 6. Without an injunction, the Plaintiff may be forced to lay off up to 150 employees, close multiple facilities in the region, cancel planned construction, and close its child abuse fellowship. Id. ¶¶ 8-10. The current application of FAQ 33 threatens to eviscerate the Plaintiff's ability to fulfill its mission of providing medical care to children in the community.

This grave harm is likely to be irreparable for two reasons. First, the $19.1 million for which repayment is demanded pays the cost of 271 full time equivalent employees, which is 11.7% of total hospital staffing. Ryan Decl. ¶ 36. Many of the Plaintiff's services, which benefit infants and children, will be directly threatened by this financial loss. See id. ¶ 37 (funds are needed to become a Level 1 pediatric trauma center, strengthen cardiac surgery program, and provide mental health services), ¶ 38 (funds are needed to operate regional Child Abuse Program). Even though an injunction would not prevent CMS from possibly recovering the funds in question at a later date, the uncertainty created by the prospect of immediate repayment is likely to cause harm, as will the possibility of an

33

accelerated repayment schedule. See Harding Decl. ¶ 7. No amount of future money can undo the harm patients will suffer from interruptions to their care if an injunction is not issued.

Second, the Defendants' sovereign immunity will prevent the Plaintiff from recovering any money at all. While "as a general matter" monetary loss is not irreparable unless it threatens a business's existence, where a plaintiff cannot recover damages due to the defendant's sovereign immunity, "any loss of income suffered by a plaintiff is irreparable per se." Feinerman v. Bernardi, 558 F. Supp. 2d 36, 51 (D.D.C. 2008). If the Plaintiff were forced to remit the funds in question, it would be unable to recover those funds, even if it ultimately prevailed on the merits of this action. The APA provides only a limited waiver of sovereign immunity. Section 702 states, in relevant part:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702 (emphasis added).

Accordingly, a claim for money damages "falls outside of § 702's waiver of sovereign immunity." Dep't of the Army v. Blue Fox, Inc., 525 U.S. 255, 263 (1999); see also Hostetter v. United States, 739 F.2d 983, 985 (4th Cir. 1984) ("In section

34

702 Congress has waived the defense of sovereign immunity in such nonstatutory review cases in which nonmonetary relief is sought, and we have so held."); Food Town Stores, Inc. v. EEOC, 708 F.2d 920, 922 (4th Cir. 1983) ("In 5 U.S.C. § 702, Congress has waived sovereign immunity in 'nonstatutory review' cases wherein nonmonetary relief is sought."), cert. denied, 465 U.S. 1005 (1984); Reynolds Assocs. v. Kemp, 974 F.2d 1331, at *3 (4th Cir. Aug. 28, 1992) (unpublished table decision) ("It is plain, however, that § 702 does not waive the sovereign immunity of the United States in actions seeking money damages."). Without an injunction, the Plaintiff would lose the millions of dollars of federal funding at issue here, and could never be made whole. Even if DMAS were willing to later provide funds to the Plaintiff, there would be no mechanism to force the federal government to remit federal funds to the state for disbursement to the Plaintiff.

The Defendants argue that the Plaintiff does not face irreparable harm because federal regulations require recovery of overpayment before the end of December 2017, and that any requirement that the Plaintiff repay funds more quickly is based on an independent decision by the state. Opp. at 12-13. The Defendants further state that the federal regulations are imposed on the state, not on the Plaintiff. Id. Moreover, the Defendants argue that the Plaintiff can "resolve the immediate

35

crisis" by appealing its audit. Id. at 13. Finally, the Defendants argue that Virginia law waives sovereign immunity and would allow the Plaintiff to ultimately recover the funds at issue. Id. at 14; VA. CODE § 32.1-325.1 ("In any case in which a final determination of overpayment has been reversed in a subsequent judicial proceeding, the provider shall be reimbursed that portion of the payment to which he is entitled plus any applicable interest, within thirty days of the subsequent judicial order.").

The Defendants' theory prizes formalism over common sense. Medicaid is a cooperative federal-state program that is funded, in substantial part, by the federal government. Virginia has not acted independently where the federal government directs it to enact a particular reimbursement scheme for a joint federal-state program that is dependent upon federal money. This is true even if the federal government allows Virginia discretion over the minutiae of the recoupment process. Moreover, even a waiver of state sovereign immunity cannot force the federal government to fund the state agency's liability to a provider. Finally, the state law's waiver of sovereign immunity contemplates challenges to the state agency's determination of the amount to be repaid, not the proprietary of the reimbursement regime itself. See VA. CODE § 32.1-325.1(A) (referring to "determination as to whether an overpayment has

been made"); Dep't Med. Assistance Servs. v. Beverly Healthcare
of Fredericksburg, 601 S.E.2d 604, 606 (Va. 2004) ("If the
provider    disagrees    with    DMAS's    annual    reimbursement
determination, it may appeal the determination under provisions
of  the  APA  and  'the  state  plan  for  medical  assistance.'")
(quoting statute); Dep't Med. Assistance Servs. v. Ablix Corp.,
2015 WL 1182558, at *4 (Va. Ct. App. Mar. 17, 2015) (describing
"an appeal of the overpayment determinations"); Ctr. Counseling
& Cmty. Affairs, LLC v. Dep't Med. Assistance Servs., 2014 WL
10190130, at *1 (Va. Cir. Ct. Aug. 22, 2014)("Under Va. Code
§ 32.1-325.1, a Medicaid provider can appeal a determination of
overpayment.").

### C. Balance of Equities and the Public Interest

An injunction will only issue where a plaintiff shows "that
the  balance  of  equities  tips  in  his  favor,  and  that  an
injunction is in the public interest." Winter, 555 U.S. at 20.
These two prongs are closely related. The court must weigh the
costs to the parties, see Splitfish AG v. Bannco Corp., 727 F.
Supp. 2d 461, 468 (E.D. Va. 2010) (Ellis, J.), and review the
hardships that an injunction would impose on the parties "and
the  weightiness  of  the  interests  the  parties  assert  are  at
stake." BP Prods. N. Am., Inc. v. Southside Oil, LLC, 2013 WL
6493598, at *5 (E.D. Va. Dec. 10, 2013) (Gibney, J.).

The Plaintiff and its patients are likely to suffer greatly

37

in the absence of an injunction. Without an injunction, the Plaintiff's ability to offer lifesaving medical care may be diminished or delayed, the effects of which will fall upon a particularly vulnerable subset of the general public: Medicaid-eligible children and their families. See Ryan Decl. ¶ 4 (the Plaintiff, in keeping with its mission, seeks "to care for all children who come to [the Plaintiff] for help regardless of whether their families have health insurance coverage or can afford the cost of their care"). The harm to the members of the public whose quality of care is diminished or who suffer because necessary infrastructure investments are not made in a timely manner cannot be undone. This harm promises to be substantial, particularly among the very sick children the Plaintiff serves.

Moreover, in enacting the Medicaid Act, Congress has determined that the public interest is served by ensuring that Medicaid-eligible patients receive medical care and by providing a payment adjustment that compensates hospitals that serve a disproportionate percentage of Medicaid patients. See 42 U.S.C. §§ 1396-1 (Medicaid's primary purpose is to provide "(1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for

38

independence or self-care"), 1396a, 1396r-4 (payment adjustment for disproportionate share hospitals). This policy accords with common sense; ensuring that hospitals can provide sick children with essential medical care serves a logical public interest. Congress's determination provides that the Medicaid shortfall is to be calculated by only accounting for Medicaid payments received. Id. § 1396r-4(g). FAQ 33 essentially overrules this section of the Medicaid Act and undoes Congress's attempt to ensure that DSH payments are sufficient to ensure that hospitals are able to treat Medicaid patients.

Any harm to the Defendants caused by an injunction would be slight. The money recovered from the Plaintiff might ultimately be redirected to another healthcare provider in need of funds. But it is perhaps just as likely that other such providers will also lose funds under FAQ 33, and there is no reason to believe that absent an injunction the money recovered by the Defendants would immediately be put to better use by any other hospital or healthcare provider. The potential harm caused to the Defendants by an injunction is less severe and more remote than the immediate and lasting harm the Plaintiff will suffer without an injunction.

## D. Injunctive Relief

To summarize, the court finds that the each of the requirements for a preliminary injunction, see Winter, 555 U.S. at 20, have been satisfied. The Plaintiff has shown both the likelihood of success on the merits and irreparable harm for issuance of the requested injunctive relief, as well as having shown the balance of equities and the public interest in its favor. Accordingly, the court **GRANTS** the Plaintiff's Motion, and **ORDERS** that the Defendants take no action to enforce FAQ 33 against the Plaintiff, absent further order of the court.

## V. BOND UNDER RULE 65

Generally, a party seeking a preliminary injunction must "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongly enjoined or restrained." Fed. R. Civ. P. 65(c). If the risk of harm to the enjoined party is remote, or if other circumstances warrant it, the court may fix the amount of the bond accordingly, and "[i]n some circumstances, a nominal bond may suffice." Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 n.3 (4th Cir. 1999) (citing Int'l Controls Corp. v. Vesco, 490 F.2d 1334 (2d Cir. 1974) (approving district court's decision to set bond amount at zero)); see also Candle Factory, Inc. v. Trade Assocs. Grp., Ltd., 23 F. App'x 134, at *5 (4th Cir. Nov. 30, 2001) (approving district court's

decision to set bond amount at $500 because enjoined party would "suffer little harm"); Red Wolf Coalition v. United States Fish & Wildlife Serv., 210 F. Supp. 3d 796, 806-07 (E.D.N.C. 2016) (requiring a $100 bond from public interest groups); Doe v. Pittsylvania Cty., Va., 842 F. Supp. 2d 927, 937 (W.D. Va. 2012) (setting bond amount at zero because "it is highly likely that plaintiff will prevail on the merits" and the defendant would suffer no harm); SEC v. Dowdell, 2002 WL 31357059, at *4 (W.D. Va. Oct. 11, 2002) (setting bond amount at $100). Here, the court finds that the risk of harm to the Defendants is remote, particularly given the retroactive nature of the enforcement sought. Accordingly, the court finds that a $100,000 bond will be sufficient.

## VI. CONCLUSION

For the reasons set forth above, the Plaintiff's Motion for Emergency Injunctive Relief is **GRANTED**. It is **ORDERED** that the Defendants shall take no action to enforce against the Plaintiff FAQ 33, absent further order of the court. It is also **ORDERED** that the Defendants shall notify the Virginia Department of Medical Assistance Services of this Opinion and Order regarding CMS's enforcement against the Plaintiff of FAQ 33. The Plaintiff is **ORDERED** to post a security bond of $100,000, within seven (7) days of the date of entry of this Opinion and Order.

The only Plaintiff before the court in this action is Children's Hospital of the King's Daughters, Inc., from which the court received specific evidence relating to its request for injunctive relief. The court declines to enter injunctive relief in favor of any other entity not a party to this action, and from which the court has not received specific evidence.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to the parties.[12]

    **IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
Chief Judge

REBECCA BEACH SMITH
CHIEF JUDGE

June 20 , 2017

---

[12] For reference purposes, an Index of this Opinion and Order is attached hereto and made a part hereof.

## INDEX

I. BACKGROUND ................................................................. 2

II. PLAINTIFF'S INVOLVEMENT WITH MEDICAID ...................... 9

III. SIMILAR LITIGATION ...................................................... 12

IV. ANALYSIS .................................................................... 15

  A. Likelihood of Success on the Merits ..................... 16

    1. Final Agency Action Requirement........................ 16

    2. Authority Under the Medicaid Act....................... 20

      a. Statutory Text ....................................... 21

      b. Legislative History ................................. 26

      c. Reference to "Uncompensated Costs" ................. 28

    3. Notice-and-Comment Requirement.......................... 29

  B. Irreparable Harm ......................................... 32

  C. Balance of Equities and the Public Interest ............. 37

  D. Injunctive Relief ....................................... 40

V. BOND UNDER RULE 65 ...................................................... 40

VI. CONCLUSION ............................................................... 41